**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**          *

**v.**                                *          **Criminal No. ELH-12-0158**

**LAURENCE J. BODE,**                 *

\* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO SUPPRESS TANGIBLE AND DERIVATIVE EVIDENCE

The defendant, Laurence Bode, through undersigned counsel, submits this Memorandum

of Law in support of his motion to suppress tangible and derivative evidence obtained from

unlawful searches and seizures on or about January 26, 2010, October 8, 2010, and possibly other

dates.  This Memorandum expressly incorporates herein Mr. Bode's Motion Requesting a *Franks*

Hearing and supporting Memorandum of Law.  Mr. Bode anticipates that additional investigation

between now and the hearing, as well as testimony anticipated at the hearing, will provide further

support for this Motion, and therefore reserves the right to supplement his briefing and arguments

based on evidence presented at the hearing on April 19, 2013.

### STATEMENT OF FACTS

In late September or early October of 2008, an agent with Immigration and Customs

Enforcement ("ICE") named Neil Burdick reportedly began investigating the website

"www.Free6.com" for possible child pornography content being exchanged by its users.[1]  *See*

_____

[1] Free6 was then, and remains today a lawful website that provides access to various adult
sexual content, including links to other adult websites and the ability to "chat" in rooms or

Search Warrant Application (attached as Exhibit 1) at 5, n.2; Burdick Report of Investigation

("ROI") dated 2/27/09, attached as Exhibit 2.  According to reports he prepared, Agent Burdick

purportedly observed that many of the users "appeared to be posting images containing child

pornography" in the public portions of the Free6 website.[2] Exhibit 1 at 6.  Within days, Agent

Burdick attempted to gain access to the operators of the website.  Apparently rebuffed by the

hosting company, Agent Burdick sent an email on October 7, 2008 to the general administrator

email address posted on the Free6 website.  In that email, Agent Burdick asked for assistance in

receiving reports about individuals in the United States who are posting child pornography on

Free6.  *See* Email Communications Regarding Access between Agent Burdick and Free6,

attached collectively as Exhibit 3.  One of the administrators of the website, Stefan Sederholm,

responded to the email.  In that email, dated October 13, 2008, Mr. Sederholm offered to provide

to Agent Burdick an administrative user name and password to the administrator area of the

Free6 website, adding that "[i]n there you will be able to search by username and see every post a

user has made in the chat (including 'private' messages and pictures) also time [sic] and IP

number of the users will be available."  *Id.*  Agent Burdick responded enthusiastically that that

"would be absolutely fantastic!"  *Id.*

　　　　After a reminder email sent the following week, the Free6 administrator sent Agent

Burdick an administrative user name – "neilburdick" – and password, as well as a website

_____

privately with another user.  As Agent Burdick notes in his search warrant affidavit exemplar,
"Free6 appears to be a legal website featuring adult pornography."  *See* Search Warrant
Exemplar, attached as Exhibit 4.  This fact was not included in Mr. Bode's search warrant.

　　　[2] Mr. Bode has requested contemporaneous evidence of these purported observations
from the government.

address for accessing the administrative portions of the Free6 website.  This user name and password were provided to Agent Burdick on Friday, October 24, 2008, and Agent Burdick wasted no time in using them to begin monitoring the communications of those accessing the Free6 website.  The very next business day, October 27, 2008, Agent Burdick began devoting the vast majority of his working time to "chat monitoring" and "site monitoring" the Free6 website. *See* Burdick Time Entries, attached as Exhibit 5.[3]  During this time, Agent Burdick used his administrative user name and password to access private chat communications, view users' IP addresses, and retrieve chats from the previous seven days, all of which were inaccessible to a regular user of the website, and viewable only because of Agent Burdick's administrative access.

After approximately three months of almost daily on-line eavesdropping, Agent Burdick met with an Assistant United States Attorney about getting approval for a national prosecution effort using the information he was obtaining from Free6.  At that meeting, there was apparently a discussion raising a concern with the legality of Agent Burdick's activities.  In an effort to address the apparent concerns of the local prosecutor, Agent Burdick again emailed the Free6 administrator for help, this time on February 12, 2009.  After noting that he had identified roughly 25 users trading child pornography on the chat portions of Free6, Agent Burdick wrote:

> Unfortunately however, we have run into a slight problem going forward with the investigation due to a loophole in American laws regarding the Internet.  The attorneys working on this case have asked me to ask you if you would consider adding one line to the warning banners that users must go through in order to access the chat portion of your website.  They have told me that if you add the line "Free6 may disclose these communications to the authorities at its discretion," following the statement reading "All posted pictures are logged and supervised,

---

[3] The time entries provided in discovery appear to have some entries and some portions of entries redacted, including some dates that are essential to this case.  Mr. Bode has requested unredacted copies of these time sheets.

etc." that we will be able to legally view the administrator's section you have provided me access to."

I realize this is a great deal to ask, and I really hate asking you to make these changes.  I will also say that if it's possible to do so, it will lead to the eradication of a good portion of the illegal activity taking place on your website.

Emails Regarding Banner Change, attached as Exhibit 6.[4]

The banner was promptly amended the next day, on February 13, 2009, exactly as requested by law enforcement.  Agent Burdick then immediately resumed nearly full-time monitoring of the website.  *See* Time Entries, Exhibit 5.

Nearly one year later, one of the agents reports describes the Free6 investigation of Mr. Bode, including the fact that on January 26, 2010, agents "via administrator privileges and screen captures, observed a user connected to the website using IP address 173.13.192.238 (TARGET IP ADDRESS) who had posted an image to another user in a 'Free6' chatroom."  *See* Warchol ROI 002, attached as Exhibit 7, at 4.  Although the affidavit does not say so, that chat being monitored by law enforcement was a private chat, between two users.  Specifically, the posting referred to in the search warrant affidavit took place on January 26, 2010, at 7:14 a.m. during a private chat.  *See* Intercepted Chats, attached as Exhibit 8.  By 9:11 a.m., agents had captured the seven preceding days worth of posts associated with the IP address (the maximum possible capture within administrator access).  Five minutes after that, someone (presumably the agents or the site administrator acting at their request) terminated access to Free6 for the target IP address.

In July 2010, Agent Burdick sent out a collateral request to Agent Warchol to finish the

---

[4] During the few weeks leading up to this request to change the banner, Agent Burdick appears to have suspended his on-line eavesdropping of the site.  *See* Burdick Time Entries, attached as Exhibit 5.

investigation of Mr. Bode and to prepare a search warrant.   Agent Warchol began promptly, and by the end of August 2010 was working on a draft search warrant affidavit.  *See* Warchol ROI 003, dated 9/22/10, at 3 (attached as Exhibit 9).  As part of her investigation, Agent Warchol sent an administrative subpoena to Comcast to confirm the registration information for the target IP address.  Comcast eventually responded, and sent documents showing that the IP address was assigned to a business in West Virginia.  *See id.* at 4.  In response to a further subpoena, Agent Warchol learned that Mr. Bode had terminated his internet service effective April 12, 2010.  *See* Comcast Response, attached as Exhibit 10.

On information and belief, Agent Warchol then submitted the search affidavit for review to United States Magistrate Judge Beth Gesner, who raised staleness concerns and declined to sign the warrant as submitted.  Agent Warchol then conducted further investigation, including surveillance of Mr. Bode's home and work, and then submitted a revised search warrant application to United States Magistrate Judge James Bredar, who signed it on October 5, 2010.

On October 8, 2010, law enforcement executed the search warrant at 163 Winter Harbor Drive, Ocean City, MD 21842.  During that search, two computers, two routers, six CDs, eight floppy discs, and seven cell phones were seized and analyzed.  Only one computer, which at the time of the search was unplugged and sitting beneath a desk, is alleged to contain any images containing child pornography.  At the last count, the government estimates that approximately 29 files containing child pornography, virtually all of them purportedly "thumbnail" artefacts of deleted images, are alleged to be on the one computer.

In this Motion, Mr. Bode seeks to exclude all evidence that was obtained as a result of law enforcement's unlawful eavesdropping on the Free6 website, as well as any evidence

obtained during the execution of the unlawful search warrant at 163 Winter Harbor Drive, Ocean City, Maryland.

## ARGUMENT

All of the evidence obtained by law enforcement for use in its case against Mr. Bode was obtained as the result of violations of the Wiretap Act and the Fourth Amendment.  Accordingly, it all must be suppressed,

## I.   LAW ENFORCEMENT VIOLATED THE WIRETAP ACT BY MONITORING MR. BODE'S ON-LINE COMMUNICATIONS IN REAL TIME

### A.   The Legal Standard for Intercepting Communications

The Wire and Electronic Communications Interception and Interception of Oral Communications Act, 18 U.S.C. §§ 2510-2520, formerly known as Title III Wiretap Act — prohibits the "real time" interception and disclosure of certain wire, oral or electronic communications, except as authorized by the statute.  In order to obtain such authorization, the government must establish probable cause that a crime has been, or is about to be, committed and that a wiretap is necessary because traditional law enforcement techniques are not likely to be successful or are too dangerous.

In 1986, Congress passed the Electronic Communications Privacy Act ("ECPA"), which amended the Wiretap provisions to distinguish between access to "real time" communications (for which a wiretap application must be approved) verus stored communications, among other changes.

There are various statutory remedies for violations of the wiretap provisions, including criminal and civil penalties, as well as suppression remedies.  Mr. Bode submits that the conduct

by law enforcement and the Free6 administrator in this case entitles him to both statutory and

constitutional suppression remedies, among others.

> **B.  Law Enforcement Impermissibly Intercepted Communications Over the Internet in Real Time in Violation of Title III**

The documents produced to date in discovery make it clear that the agents were actively

monitoring one-on-one private chats, in real time, for evidence of illegal activity.  Among the

evidence for this is the following:

1.  Agent Burdick represented in his power point summary of Free6, created sometime

after March 26, 2009, that "Most trading of child pornography takes place in private chats,

although some predators do post child pornography in the public sections of the "chat" portion so

that it may be seen by all users."  *See* Free6 power point, at 5 (attached as Exhibit 11).  This

undercuts any suggestion that agents were just viewing public chats while monitoring the

website.

2.  In the same power point, Agent Burdick has a slide captioned "Recording Suspects,"

in which he writes:

> CEIG agents have been recording suspect postings using publicly available screen-capture software.
>
> The suspected child pornography images sent by suspects are also downloaded so that their SHA1/Hash values may be compared with images found on suspects' computers during forensic examinations.

*Id.*

3.  In her ROI 002, dated 8/25/10 (attached as Exhibit 7), ICE agent Warchol describes

the Free6 investigation of Mr. Bode, including the fact that on January 26, 2010, agents "via

administrator privileges and screen captures, observed a user connected to the website using IP

address 173.13.192.238 (TARGET IP ADDRESS) who had posted an image to another user in a 'Free6' chatroom."  *See id.* at 4.

4.  Between October 27, 2008 (when Agent Burdick received his administrative access) and March 30, 2010, agent Burdick's time entries reflect that he devoted most days to monitoring the Free6 website.  The entries that are not redacted generally describe his activity as "chat monitoring," "site monitoring," "target monitoring," and later, "collaterals."

5.  On January 26, 2010, Agent Burdick's time sheets reflect "site monitoring" as well as a redacted entry.  *See* Exhibit 5.[5]  In contemporaneous handwritten notes Agent Burdick took of his "site monitoring" that day, he describes the activity he sees associated with the user name "DadonCam."  *See* Exhibit 8. Agent Burdick's notes reflect the IP address associated with that user name, as well as the content of private chats, so he is clearly reviewing content using his administrative privileges.  In addition, given that the order of his notes follows the real time flow of the chats (bottom to top) rather than a top down reading (as you would more naturally do if viewing logged entries), the ineluctable conclusion is that Agent Burdick was reviewing real time private chats on January 26, 2010.

6.  In one of his ROI, Agent Burdick describes how the Free6 administrator provided him with "access to the administrator's section of www.Free6.com which allowed SA Burdick to access all traffic taking place in the "chat" portion of this website."   *See* Exhibit 2, at 4.

7.  The search warrant affidavit describes how Agent Burdick began the Free6 investigation, including the fact that Agent Burdick was given access to the administrator's section of Free6, which allowed him to see "the IP Addresses of the persons making posts on

---

[5] Mr. Bode has requested an unredacted copy of these time entries.

Free6.  It also gave law enforcement the ability to review all traffic taking place in the Free6 chat rooms, both public and private chats.  SA Burdick told your affiant that he noticed a significant amount of child pornography being traded on Free6 in private chats."  *See* Exhibit 1 at 6-7.

8.  The search warrant affidavit describes how the investigation into Mr. Bode began, specifically that Agent Burdick, "using administrator privileges and screen captures," observed an individual using a specific IP address post an image to another user in a Free6 chatroom.  *See* Exhibit 1 at 9.  Although the affidavit does not say so, the chat being monitored by law enforcement was a private chat, between two users.  This can be seen in a variety of ways, including in the table of postings included in the search warrant – the image allegedly posted on January 26, 2010 was posted that day to another specific user, *see id.* at 10.  In addition, it is clear from the captured chats that the posting that caught the attention of law enforcement took place on January 26, 2010, at 7:14 a.m. during a private chat.  *See* Intercepted Chats, attached as Exhibit 9.

9.  Agents then captured as many chats as they could based on the IP address of the suspect posting.  *See id.*  According to the search warrant, Free6 only logged copies of chats and posts for seven days.  *See* Exhibit 1 at 7.  Given the beginning time of the captured data, it appears that Agent Burdick captured the chats on January 26, 2010, sometime before 8:02 a.m. PST.[6]  *See id.*  Less than an hour later, Mr. Bode was banned from the website.[7]

10.  In the government's supplemental forensic report, the forensic examiner describes

---

[6] The times shown on the Intercepted Chats is PST, as the server for Free6 was maintained in California.

[7] It is unclear whether Agent Burdick or Free6 enacted the ban; Mr. Bode requests clarification of same.

how the material he reviewed was captured from Free6:

> The LA database provided is the result of the agents' activities as administrators on the free6 website. They were monitoring/watching the activity on the website. When suspicious files were uploaded, they captured the content of activity.

Exhibit 13 (Mar. 29, 2011 forensic report), ¶ 4.

Mr. Bode contends that real time, covert monitoring of any on-line communications, whether in public or private "chats," would run afoul of the prohibition against wiretapping, and thus that law enforcement acted beyond the law when it monitored any of his on-line activity in real time.[8]

Finally, to the extent the government tries to suggest that law enforcement was not monitoring real time communications because the communications passed through Free6's server first, this argument must fail. First, because of law enforcement's administrative, real time access to the website, there was no delay or lag time at all between a user's posting and the agent's ability to review that posting. In addition, even if the postings were routed through a server or some other process, it would not affect the analysis here because Free6 was acting as an agent of the federal government the moment it gave Agent Burdick administrator privileges. The website administrator demonstrated its continuing agency when it changed the website's warning banner immediately and exactly as requested. As an agent of the government, the website administrators' actions are attributable to the government as they were acting in concert with the government to review the private on-line communications of users of the website. .

## II.     THE CAPTURE OF THE CONTENT OF MR. BODE'S PRIVATE ON-LINE

---

[8] A public advocacy website "Smoking Gun" has an article about the government's improper access of Free6. *See* Exhibit 14, also available at http://www.thesmokinggun.com/documents/sex/porn-site-gave-federal-agents-free-rein.

**COMMUNICATIONS WITHOUT A SEARCH WARRANT VIOLATED THE
FOURTH AMENDMENT**

**A.      Mr. Bode Had a Reasonable Expectation of Privacy in the Contents of His Private
Chats on Free6 and the Warrantless Search and Capture of These Communications
Violated His Fourth Amendment Rights.**

Mr. Bode submits that the government violated his Fourth Amendment rights to be free

from unreasonable searchs and seizures when Special Agent Burdick seized the contents of Mr.

Bode's private chats within the Free6.com website.

As Special Agent Burdick describes, Free6.com had both a public and private chat

features.  This chat feature allows users to access certain "rooms" within the site.  In a public

chat, a user can hold online conversations, post messages, photos, graphics, etc, to the entire

"room".  Free6.com also offered a private chat feature.  In a private chat, the conversation or

exchange of photos or messages, are visible only to a specific user.

Special Agent Burdick was able to access the private chat features, but only because he

was given an administrator username and password by the site administrator.   Without this

username and password, Agent Burdick would only have been able to see the contents of public

chat rooms.  Mr Burdick never sought or received a search warrant to review Mr. Bode's private

chats.  Because Mr. Bode had a reasonable expectation of privacy in his private chats, the

warrantless search or capture of these chats violated the Fourth Amendment.

It is well-settled law that a "search" occurs when the government infringes upon 'an

expectation of privacy that society is prepared to consider reasonable.'" *United States v.

Warshak,* 631 F.3d 266, 284 (6th Cir. 2011) (*citing United States v. Jacobsen*, 466 U.S. 109, 113

(1984)).  When determining whether the expectation of privacy is reasonable, courts first

consider whether a defendant had a subjective expectation of privacy and second, whether society is willing to recognize that expectation as reasonable.  *See California v. Ciraolo*, 476 U.S. 207, 211 (1986).

The first inquiry, whether Mr. Bode had a subjective expectation of privacy, weighs in Mr. Bode's favor.  First, Free6.com differentiates between public and private chats.  According to the affidavit in support of the search warrant, a person who wants to engage in a private, one-on-one conversation with another person must leave the public chat room and enter into a private chat.  *See* Exhibit 1 at 7, n.4.  Only the two people engaged in the private chat can see the contents of the communication.  In fact, as Special Agent Burdick indicates, without the administrative username and password, he would not have had access to these private chats.  *See* Exhibit 3.  Thus, Mr. Bode chose to engage in a private conversation with another person, indicating his subjective expectation of privacy in his private chats.

Additionally, Mr. Bode's expectation of privacy is one that society recognizes as reasonable.  While no court has addressed the issue of whether an individual has a reasonable expectation of privacy in private chat, numerous courts have held that an individual has a reasonable expectation of privacy in personal emails.  *See, e.g., United States v. Warshak*, 631 F.3d at 285 (comparing emails to letters and telephone calls, which receive Fourth Amendment protection), *United States v, Forrester*, 512 F.3d 500, 511 (9 th Cir, 2008) (holding that email and mail are identical for purposes of Fourth Amendment analysis.  Similarly the United States Supreme Court held that public employees had a reasonable expectation of text messages contained in a city-issued cell phone.  *See e.g., City of Ontario v. Quon*, ____ U.S.___ 130 S. Ct. 2619, 2631 (2010).

*Warshak*'s analysis is particularly helpful in the instant case.  In *Warshak*, the Sixth Circuit held that under the Stored Communication Act, email account holders have a reasonable expectation of privacy in the contents of their emails messages that are stored with an internet service provider.  *United States v. Warshak,* 631 F.3d at 285-86.  In doing so, the court held that emails are similar to letters and phone calls, means of communication that are entitled to Fourth Amendment protection, because email has become an increasingly common way for individuals to communicate and share sensitive and intimate information.  *Id.* at 284.  In this holding, the Sixth Circuit rejected the argument that email users do not have a reasonable expectation of privacy because a third-party intermediary, such as an internet service provider, can access the communications.  *Id.* at 287-88 (noting that the ability of third-party to access the communication "cannot be sufficient to extinguish a reasonable expectation privacy).  Noting that this was a case of first impression, the Sixth Circuit cautioned that "the Fourth Amendment must keep pace with the inexorable march of technological progress or its guarantees will wither and perish.  *Id.* at 285 (*citing Kyllo v. United States,* 533 U.S. 27, 34 (2001)).

Similarly, Mr. Bode's private chats, which are analogous to texts and emails, enjoy Fourth Amendment Protection, and a warrant was required before law enforcement could access its contents.  Moreover, the fact that Free6.com could access these chats does not defeat Mr. Bode's reasonable expectation of privacy.  These chats were private conversations between Mr. Bode and another person, that were purposefully taking place away from public chat rooms at free6.com.  Additionally, private chats over the internet, like emails and texts messages, are communications that society is prepared to accept as personal.  The search and seizure of these private internet messages without a warrant violated the guarantees of the Fourth Amendment.

Accordingly, the contents of these message should be excluded.

**B.      There Was No Probable Cause to Search Mr. Bode's Home Because the Affidavit in Support of the Search Warrant Affidavit Was Based on Stale Information.**

Probable cause to search Mr. Bode's residence is solely based on Special Agent Burdick's observations of Mr. Bode's activity on Free6.com between January 21, 2010 and January 26, 2010.  The search warrant, however, was not issued until October 5, 2010.  This unreasonable delay rendered the information in the search warrant stale and negates a finding of probable cause.

It is well-settled law that a search warrant may not issue unless there is "fair probability that contraband or evidence of a crime will be found at a particular place." *Illinois v. Gates*, 462 U.S. 213 (1983).  The Fourth Circuit has further held that "[a] valid search warrant may issue only upon allegation of facts so closely related to the time of the issue of the warrant so as to justify a finding of probable cause *at that time*. *United States v. Doyle,* 650 F.3d 460 (4th Cir. 2011) (*citing United States v. McCall*, 740 F.2s 1331, 1335-36 (4th Cir. 1984)(emphasis in original)).  *See also United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006) (holding that a warrant is stale if the probable cause, while sufficient at some point in the past, is now insufficient as to evidence at a particular location).  Resolution of the issue of staleness "must be determined by the circumstances of each case." *Srgo v. United States*, 287 U.S. 206, 201-11 (1932).

In the context of child pornography, several circuits have held that even a substantial delay between the alleged distribution of child pornography and the issuance of a search warrant does not defeat a finding of probable cause.  *See, e.g., United States v. Richardson* 607 F.3d 370,

375 (4th Cir. 2010) (concluding that a four-month lapse did not make the probable cause stale in a child pornography case); *United States v. Lapsins*, 570 F. 3d 758, 767 (6th Cir. 2009) (nine-month delay between initial email with suspected child pornography and the search warrant application did not render the information stale for probable cause purposes); *United States v. Newsom,* 402 F.3d 780, 783 (7th Cir. 2005) (holding that information that is a year old is not stale as a matter of law where child pornography is concerned because child pornography collectors maintain pornographic images for a long period of time).

Despite the cases cited above, no court has ever held that once probable cause exists to search for child pornography, that probable cause remains valid forever.  *United States v. Boyle*, 650 F.3d at 474.  *See also United States v. Prideaux-Wentz*, 543 F. 3d 954, 658 (6th Cir. 2008) (noting that there must be "some limitation on the principle" that the staleness argument takes on a different meaning in the context of child pornography).  Mr. Bode submits that circumstances unique to his case renders the probable cause stale.

Probable cause to search Mr. Bode's residence is based on uploads using an IP address associated with Mr. Bode's address between the dates of January 21, 2010 and January 26, 2010. According to the Affidavit in Support of a Search Warrant, during this six day period, Mr. Bode allegedly uploaded an image with the title "~2spa102.jpg" on five separate occasions to Free6.com chat rooms and uploaded another image with the title"-11radator.jpg" on eight occasions to the Free6.com chat rooms.  *See* Exhibit 1 at 9-11.

On April 12, 2010, in response to an administrative subpoena, Comcast provided information for IP Address 173.13.192. 238.  Comcast reported that this IP address on the dates in question – January 21-26, 2010 – belonged to Mr. Bode at 163 Winter Harbor Drive, Ocean

City, Maryland 21842. *See* Exhibit 11. Four months later, in response to another administrative subpoena, Comcast responded that the IP address 173.13.192. 238 was active and "currently statically assigned" to a business in West Virginia. *See id.* Further investigation revealed that Mr. Bode had disconnected the Comcast internet account on or about April 12, 2010. On September 24, 2010, Comcast indicated that Mr. Bode's home was connected to the internet as of September 24, 2010, with a different IP address.[9] *See id.*

Thus, it is clear that all of the information that made up probable cause occurred during six days in January of 2010. There are no facts in the affidavit that Mr. Bode uploaded or received any images before or after this period. In fact, as the affidavit makes clear, Free6.com, and its chat rooms, had been removed from the internet by the website host. *See* Exhibit 1 at 7-8. Further, Comcast confirmed that the IP address associated with the uploads to Free6.com was no longer assigned to Mr. Bode and that Mr. Bode had disconnected the internet at his home on or about April 12, 2010. *Id.* at 22.

Lastly, there was no intervening event between January 26, 2010 and October 5, 2010 that would revive the stale information. See *United States v. Harvey*, 2 F.3d 1318, 1322023 (3d Cir. 1993) (noting that evidence that a defendant possessed child pornography 15 months prior to the execution of the search warrant was not stale because there was evidence of additional acquisition of child pornography two months prior to the execution of the warrant). In the instant case, the events that occur after January 26, 2010, such as the disconnection of the internet at Mr. Bode's residence and the taking down of Free6.com, do nothing to revive stale information;

---

[9]It appears that some follow-up investigation regarding IP addresses was conducted after Magistrate Judge Gesner rejected a previous application for a search warrant of Mr. Bode's residence on grounds of staleness.

rather they negate a finding of probable cause.

The stale information in affidavit cannot be saved by the conclusory statements regarding the habits of "individuals who have a sexual interest in children or images of children" made in paragraph 20 of the affidavit.  Exhibit 1 at 14-17.  First, it is not clear that Mr. Bode is an "individual who [has] a sexual interest in children or images of children."  Free6.com, where all of the uploads took place, was a legal site dedicated to **adult** pornography.  Second, Mr. Bode uploaded only two separate images of alleged child pornography thirteen times during a six day period.[10]  Thus, he can hardly be described as a "collector" that maintains a large amount of child pornography on his computer.

In sum, there are no facts contained in the affidavit that show that child pornography would be found on his computer in October of 2010.  The information provided to make a showing of probable cause is stale and therefore, the search warrant was invalid.

**C.      The Search Warrant Lacked Probable Cause**

Even setting aside the flagrant violations of the Wiretap Act and the Fourth Amendment that supplied much of the information contained in the search warrant affidavit, the warrant on its face is facially deficient.  A search warrant must present sufficient facts within its four corners to establish probable cause to search a particular person or place.[11]  Probable cause is defined as "a

---

[10] Note that it is questionable whether even the two files described as child pornography were in fact child pornography.  *See infra* n.13 and accompanying text.

[11] Most of Paragraph 12 of Mr. Bode's copy of the search warrant is currently redacted. Mr. Bode has requested an unredacted copy, but on information and belief, the redacted information does not provide any additional support for probable cause but rather deals with criminal charges against the Free6 administrator who provided administrative access to Agent Burdick.  It appears that Mr. Sederholm was arrested in April 2009 and is currently serving a life sentence in the Philippines for running an interactive sexual content website that used both adult

fair probability that contraband or evidence of a crime will be found in a particular place."
*Illinois v. Gates*, 462 U.S. 213, 238 (1983).  More specifically, the "known facts and
circumstances" must be sufficient "to warrant a man of reasonable prudence in the belief that
contraband or evidence of a crime will be found."  *Ornelas v. United States*, 517 U.S. 690, 696
(1996).  "The evidence needed to establish probable cause is more than a mere suspicion, rumor,
or strong reason to suspect but less than evidence sufficient to convict."  *United States v. Han*, 74
F.3d 537, 541 (4th Cir. 1996) (citation omitted).

In this case, the application in support of the warrant failed to meet that standard.  The
statements supporting probable cause that actually related to Mr. Bode, and to the assertions that
he was likely engaged in illegal conduct, relied entirely on the fact that Mr. Bode had allegedly
posted four unique images on multiple occasions on a single website and engaged in some sexual
banter on an adult pornography website.  Although there are many cases standing for the
proposition that evidence that a defendant possessed or distributed images containing child
pornography can constitute probable cause to search for evidence of child pornography, the four
images associated with Mr. Bode at the time the search warrant was sought and executed were
not, in fact, child pornography but rather child erotica.

Although Mr. Bode does not necessarily agree with the government's precise definition,
the search warrant affidavit itself provides a definition of child erotica as follows:

> 'Child erotica' means materials or items that are sexually arousing to persons
> having a sexual interest in minors, but that are not, in and of themselves, obscene

---

and minor participants.  *See* Exhibit 14; http://www.bbc.co.uk/news/world-asia-pacific-
13356721.  If further investigation reveals that Agent Burdick was aware of a pending criminal
investigation against Mr. Sederholm when he contacted him, or was in any way involved in his
criminal investigation, Mr. Bode reserves the right to supplement this Motion.

or illegal.  In contrast to 'child pornography,' this material does not necessarily depict minors in sexually explicit poses or positions.  Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries.

Exhibit 1 at 12, n.7.    Even assuming that Mr. Bode posted child erotica, that alone is not sufficient to establish probable cause to search for child pornography.  *See, e.g., United States v. Hansel*, 2006 WL 3004000, *11 (N.D. Ohio Oct. 20, 2006)(citing cases).[12]

In this case, the search warrant affidavit described four separate images, two of which were characterized as child pornography, and two as child erotica.  Examination of the two images characterized as child pornography, however, makes clear that those images are, at worst, child erotica.  Indeed, one of the two images characterized as child pornography in the search warrant (Exhibit B) was characterized by the affiant just a few weeks earlier as child erotica.  *See* Exhibit 10 at 4.[13]  Mr. Bode requests that the government make available for the Court's review the four images described in the search warrant affidavit so that they may be considered for purposes of this Motion.

In light of (1) the small number of images, (2) the fact that the images described were

_____

[12] The search warrant application cites two cases for the proposition that child erotica has sometimes been deemed admissible in child pornography cases.  Neither of the cases cited, however, supports the proposition that evidence of child erotica can constitute probable cause to search for child pornography.

[13] Specifically, Agent Warchol notes that "Exhibit A" is child erotica.  This image description matches that of the Exhibit B image found at page 11 of the search warrant application, as well as one of the images charged in Counts One and Two.  *See* Exhibit 1 at 11. Note, however, that it is not entirely clear which images were shown to the reviewing court, as a ROI drafted by the search warrant affiant, shortly after the search warrant was signed, describes the two images shown to the court, and one is a different image than that described in the search warrant.  Moreover, the two images described in this ROI were both described as child erotica in an earlier ROI.  *Compare* See Warchol ROI 006, dated 10/19/10 at 3 (attached as Exhibit 15), *with* Exhibit 10 (Warchol ROI 003, dated 9/22/10)

actually child erotica, (3) the brief period of time described in the affidavit during which the

government alleges Mr. Bode posted child pornography (five days), (4) the passage of time

between the alleged postings and the execution of the search warrant, (5) the disconnection of

internet service, and (6) the absence of any evidence of any child pornography activity after serve

was resumed, taken together, the available facts contained within the four corners of the search

warrant do not support probable cause to search Mr. Bode's house for evidence of child

pornography.

### III.   Mr. Bode's Statement Must be Suppressed Because it was the Fruit of the Poisonous Search and There Was No Attenuation of the Taint.

In general, evidence obtained through a Fourth Amendment violation is inadmissible. This

applies to both physical evidence and verbal statements. *Wong Sun v. United States*, 371 U.S. 471,

484-85 (1963).  A constitutional violation by law enforcement officers, and the evidence obtained

from this violation is inadmissible unless the causal connection between the illegal action and

obtaining the evidence has "become so attenuated as to dissipate the taint." *Nardone v. United

States*, 308 U.S. 338, 341 (1939). An intervening "act of free will [can] purge the primary taint of

the unlawful invasion." *Wong Sun,* 389 U.S. at 486.  The factors weighed in determining

attenuation are:  (1) the amount of time between the illegal action and the acquisition of the

evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the

official misconduct.  *See United States v. Seidman*, 156 F.3d 542, 548 (4th Cir. 1998); *Brown v.

Illinois,* 422 U.S. 590 (1975); *Wong Sun v. United States*, 371 U.S. 471 (1963).  The finding of

attenuation is made only after considering all the facts and circumstances surrounding the case.

*See Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973).  This determination requires a

-20-

"careful sifting of the unique facts and circumstances of each case." *Id.* at 233. The prosecution

has the burden of showing admissibility.  *See Brown*, 422 U.S. at 604.

The controlling case is *Brown v. Illinois,* 422 U.S. 590 (1975).  In that case, the petitioner

was arrested without probable cause and transported to the police station.  The officers informed

him of his Miranda rights, which he waived, and Brown subsequently confessed approximately

two hours after the Fourth Amendment violation. *Id.* at 591. The relevant question was "whether,

granting establishment of the primary illegality, the evidence to which instant objection is made

has been come at by exploitation of that illegality or instead by means sufficiently distinguishable

to be purged of the primary taint." *Id.* at 599.  The Supreme Court answered that the confession

was a fruit of the Fourth Amendment violation and thus that evidence was inadmissible.  *Id.* at

605. In reaching this conclusion, the Court found that the Miranda warning itself was not a

sufficient intervening factor to justify the admission of the statement:

> The *Miranda* warnings are an important factor, to be sure, in determining whether
> the confession is obtained by exploitation of an illegal arrest. But they are not the
> only factor to be considered…If *Miranda* warnings, by themselves, were held to
> attenuate the taint of an unconstitutional arrest, regardless of how  wanton and
> purposeful the Fourth Amendment violation, the effect of the exclusionary rule
> would be substantially diluted. *See Davis v. Mississippi,* 394 U.S. 721, 726-27
> (1969). Any incentive to avoid Fourth Amendment violations would be eviscerated
> by making the warnings, in effect, a "cure-all," and the constitutional guarantee
> against unlawful searches and seizures could  be said to be reduced to "a form of
> words." *See Mapp* v. *Ohio,* 367 U.S. at 648. *Id.* at 602-604.

The decision relied heavily on the fact that "Brown's first statement was separated from

his illegal arrest by less than two hours, and there was no intervening event of significance

whatsoever." *Id.* at 604. The Court thus did not view the Miranda warning as an "intervening

event of significance."  Similarly, the Supreme Court found no attenuation in *Taylor v. Alabama*,

457 U.S. 687, 691 (1982), in which a confession was made six hours after an illegal arrest when

the defendant was kept in continuous police custody, even though *Miranda* warnings had been furnished three times during those six hours.

Under this analysis because the search of the defendant's home violated his Fourth Amendment rights, any statements made to the officers who entered his house are fruits of the poisonous tree and must be suppressed.  And unlike in *Brown*, Mr. Bode was not even advised of his Miranda rights, so there was nothing to break the causal link between the Fourth Amendment violation and the evidence and statement obtained.  And as in *Brown*, the interrogation followed very quickly after the illegal search, providing further support for the position that the taint of the illegal search was not attenuated.

Even if the Court does not find that the evidence was fruit of the poisonous tree, the evidence should still be suppressed as Mr. Bode's consent to make a statement was not voluntarily given, as is evidenced by the circumstances under which Mr. Bode's consent was obtained.  As will be more fully developed at the hearing, Mr. Bode was not advised of his *Miranda* rights, and the conduct of law enforcement overwhelmed Mr. Bode's ability to exercise a voluntary decision to consent to police questioning.

## CONCLUSION

For the reasons set forth in this Memorandum of Law, Mr. Bode's Motion and Supporting Memorandum in Support of a *Franks* Hearing, as well as those to be set forth in the reply briefs and to be further developed at a hearing on this matter, Mr. Bode requests that this Court suppress all evidence obtained from the unlawful search and seizure of his on-line communications by law enforcement, as well as all evidence obtained from the unlawful search of 163 Winter Harbor Drive, Ocean City, Maryland, and to suppress all statements by Mr. Bode, and for such other relief

as this Court deems just and necessary.

Respectfully Submitted,


JAMES WYDA
Federal Public Defender
for the District of Maryland
/s/


_____
JULIE L.B. JOHNSON (#27746)
Staff Attorney
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Tel: (301) 344-0600
Fax: (301) 344-0019
Email: julie_johnson@fd.org


/s/_____
EBISE BAYISA (#91857)
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, Maryland 20770
Tel: (301) 344-0600
Fax: (301) 344-0019
Email: ebise_bayisa@fd.org