**AFFIDAVIT**

I, NAME, being duly sworn, do hereby depose and state:

I.   **INTRODUCTION**

1.    I am a Special Agent with the Department of Homeland
Security, Immigration and Customs Enforcement ("ICE"), assigned
to the Special Agent in Charge ("SAC") LOCATION.  I HAVE BEEN
EMPLOYED SINCE… I LOVE ME PORTION

II.   **PURPOSE OF AFFIDAVIT**

2.    This affidavit is made in support of a warrant to
search ADDRESS (the "SUBJECT PREMISES") described below in this
affidavit and in Attachment A, and to seize evidence, as
specified in Attachment B this affidavit, of violations of 18
U.S.C. Section 2252A(a)(2) (receive or distribution of child
pornography) and 18 U.S.C. Section 2252A(a)(5)(B) (possession of
child pornography).

3.    The facts set forth in this affidavit are based upon
my personal observations and training, prior investigations and
where noted, information related to me by other law enforcement
officials and witnesses.  The affidavit is intended to show that
there is probable cause for the requested search warrant and
does not purport to set forth all of my knowledge of, or
investigation into, this matter.

III. **LOCATION TO BE SEARCHED: THE SUBJECT PREMISES**

4.    The premises to be searched is described in Attachment

A of this affidavit and as follows: ADDRESS hereinafter
described as the "SUBJECT PREMISES". The SUBJECT PREMISES is
further described as a…

## IV.   BRIEF SUMMARY

5.   As set forth in greater detail below, ICE has been
investigating a website called www.Free6.com ("Free6").   Free6
appears to be a legal website featuring adult pornography.
However, Free6 has an Internet chat function that allows users
of the site to chat on-line and trade images with each other.
Certain individuals have been misusing this chat function to
trade child pornography.   No registered account is necessary for
an Internet user to chat on Free6; all one has to do is log on
to the website and select a screen name for that chat session.
The next time that person logs on, he must again select a screen
name, and there is no requirement that the person select the
same screen name he used before.   Thus, numerous different
screen names could actually be the same individual.

6.   As set forth below, on DATE, the screen names "SCREEN
NAME" and "SCREEN NAME" were used to access Free6 chat rooms.
On DATE, "SCREEN NAME," and then "SCREEN NAME," posted images of
child pornography.   Despite the different screen names and
dates, the IP Addresses for each of the text and image postings
resolves back to the same Internet account, at the SUBJECT

2

PREMISES.  I believe someone used at least one computer from the SUBJECT PREMISES (the location where the IP address resolves back to) to post child on the Free6 website over the internet under the user names "SCREEN NAME" and "SCREEN NAME."  I further believe that NAME OF TARGET, a XX year old wo/man who lives at the SUBJECT PREMISES, is the individual who did so.

## V.   DEFINITION OF TERMS

7.   In this affidavit, "child pornography," "visual depiction," "minor," and "sexually explicit conduct" are defined as set forth in Title 18, United States Code, Section 2256.

a.   Computers and Child Pornography.  Based on my knowledge, training and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other.  Child pornography formerly was produced using cameras and film (either still photography or movies).  The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images.  There were definable costs involved with the production of pornographic images.  To distribute these

3

images on any scale required significant resources.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public.  The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

b.   The development of computers has changed this; computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

c.   Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner.  With the advent of digital cameras, the images can now be transferred directly onto a computer.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Electronic contact can be made to literally millions of computers around the world.

d.   The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years.  These drives can store hundreds of thousands of images at very high resolution.

4

e.   Internet.   The Internet is a collection of computers and computer networks which are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information. Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even when the two computers are located in the same state.

f.   Internet Service Providers.   Any individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").   ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP.   ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.   Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account

5

application information, and other information both in computer data and written record format.

g. IP Addresses. An Internet Protocol address ("IP address") is a unique numeric address used by each computer on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

h. When a customer logs into the Internet using the service of an ISP, the computer used by the customer is assigned an IP address by the ISP. The customer's computer retains that IP address for the duration of that session (i.e., until the user disconnects), and the IP address cannot be assigned to another user during that period.

i. The term "Online Chat Room" is defined as the real time visual interface which displays messages and responses of participants who are using online chat. Chat rooms are usually devoted to specific topics such as US politics; however, there are a number of general chat rooms which are devoted to any issue the participants wish to bring up. Participants usually communicate by typing their contributions into a simple

6

text box line by line.  The primary use of a chat room is to share information via text with a group of other users.  New technology has enabled the use of file sharing and webcams to be included in some programs and almost all Internet chat rooms or messaging services allow users to display and/or send pictures.

    j.   The term "Open Source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

    k.   The term "Web site" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

    l.   The term "Computer system and related peripherals, and computer media" as used in this affidavit refers to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or

photographs, and other visual depictions of such Graphic

Interchange formats, including, but not limited to, JPG, GIF,

TIF, AVI, and MPEG.

**VI.**   **PROBABLE CAUSE**

A.   Background Investigation conducted on Free6

8.     Los Angeles ICE SA Neil Burdick, of the Child

Exploitation Investigations Group (CEIG), has advised me that

while proactively monitoring the Internet for violations related

to federal child exploitation statutes, he discovered a publicly

accessible website known as "www.Free6.com."  This website

offered some items for free viewing, such as images and links to

various adult pornography websites.  The Free6 website also

offered a special "chat" feature where users were able to access

an assortment of different "rooms."  In these Free6 chat rooms,

a user was able to hold online text conversations, post

messages, photos, graphics etc., to the entire room.  A user was

also able to have "private" chats that were visible only to a

specific user.  This affidavit describes the posting of child

pornography through this chat function on Free6.[1]

9.     For a Free6 user to access any of the Free6 chat

features, the user had to go through a number of steps,

---

[1]   At any given time there could have been thousands of users on
the Free6 website using the chat function.  For example, on
September 25, 2009 at 2:40 p.m., SA Burdick saw that there were

including setting up a screen name and agreeing to abide by Free6 chat room rules.

10.   First, the user would go to the main Free6 home page, and click on a button labeled "chat."  That took the user to a webpage where s/he was required to indicate whether s/he was male or female, and then select a screen name for that chat session.  Free6.com did not require users to enter their true identity or to register in any way with the website.  The screen name did not act as any sort of permanent account; it was only valid for the user's current chat session.  Users were able to use different screen names each time they logged into the chat portion of the website.

11.   The webpage on which a user selects a screen name also showed the following warning banner:

"The Free6.com Chat rules
Posting photos, graphics or cartoons showing persons under 18 years of age is not allowed.  Child pornography or other illegal material will immediately be reported to the posters local authorities.  Requesting images of the above nature is not allowed.  Spamming or advertising for websites or products is not allowed.  Users breaking these rules will be banned.  All posted pictures and conversations, public and private, are

---

1,400 people logged in to Free6 chatrooms.

logged and supervised."

12.   Once the user entered a screen name on the page featuring the first warning banner, s/he clicked on a button that said "Log In."   This took the user to a second warning banner.   This page featured a picture of a young girl and the words:

> CHILD PORNOGRAPHY…
>
> BEHIND EVERY PICTURE THERE IS PAIN!
>
> HELP US REPORT IT!

Posting photos, graphics or cartoons showing persons under 18 years of age is not allowed.   Child pornography or other illegal material will immediately be reported to the posters local authorities.   Requesting images of the above nature is not allowed.   All posted pictures and conversations, public and private, are logged and supervised.   Free6.com may disclose these communications to the authorities at its discretion.[2]

---

[2] With the exception of the last sentence in this warning, this process and these warnings remained unchanged from the time SA Burdick first accessed the site in October 2008 until February 26, 2010 when the website was shut down.   On February 13, 2009, Free6 added the last sentence in this warning, which states "Free6.com may disclose these communications to the authorities at its discretion," at SA Burdick's request.   The last time SA Burdick logged onto Free6, and saw the warning, was on February 25, 2010.

13.    Underneath this warning was a button marked "ACCEPT." A user was required to click on the button indicating that they accepted the warning in order to proceed to the chat portion of the website.  Thus, <u>each</u> <u>time</u> a user wished to chat on Free6, s/he must first have viewed the warning, including the sentence that Free6 may disclose the communications to the authorities, and indicated that that s/he accepts it.  One was not able to use the chat function by bypassing the warning, because even if a user had the specific Internet address of the chatroom, they would have had no screen name to chat under.[3]

14.    SA Burdick first entered the Free6 chat rooms in October 2008.  Despite the warnings against posting child pornography, however, SA Burdick noticed that many of the users appeared to be posting images containing child pornography. These posts were in the public chat rooms, available to anyone who logged onto Free6.

15.    On October 7, 2008, SA Burdick contacted the administrators of Free6 via email, asking for help in identifying the IP Addresses of the individuals posting child pornography.  SA Burdick informed me that Free6 was cooperative

---

[3]    A user only needs a screen name to use Free6's interactive chat functions.  A user can browse the website portion without obtaining a screen name, and without accepting the particular warning outlined above.  This affidavit pertains to the posting of child pornography through the chat function.

with law enforcement efforts, and that they volunteered to assist ICE in identifying individuals trading child pornography on the website. Shortly thereafter, and sometime in October 2008, Free6 gave ICE an administrative password, granting law enforcement access to the administrator's section of Free6. This allowed agents to see the IP Addresses of the persons making posts on Free6. It also gave law enforcement the ability to review all traffic taking place in the Free6 chat rooms, both public and private chats.[4] SA Burdick told me that he noticed a significant amount of child pornography being traded on Free6 in private chats. In addition, it is my understanding that Free6 logged all chats/posts for one week, and I understand that they were indefinitely logging all chats/posts which were the subject of user complaints.[5] With the administrative password, law enforcement officials were able to view all logged chats/posts made from the same screen name, or the same IP Address.

16. On February 26, 2010, Los Angeles CEIG Special Agents noticed that both the main portion of, and the chat portion of

---

[4] Chat rooms on Free6 are "public" when any user may join a particular chat session. They are "private" when individual users open their own chat streams with another user, or users, of their choice. These "private" chats are invitation-only.

[5] For example, if a Free6 user saw a post that contained child pornography, s/he could report that post to Free6 as a violation of the rules. The reported post would then be kept by Free6 indefinitely, and law enforcement could review the user's conduct. The activity in question is stored, by IP address.

www.free6.com had been removed from the internet by the company responsible for hosting the website.[6]  Los Angeles CEIG Special Agents subsequently contacted one of the administrators with whom they had communicated with in the past, and discovered that this man was currently incarcerated in the Philippines and facing charges for running an adult pornography business contrary to Pilipino law.  SA Burdick told me he corroborated this by reviewing records from the Philippines' National Bureau of Investigation, where he learned that the administrator appears to have a pending "inquest" in the Philippines under the "anti-trafficking in persons act."

B.    Someone from the Target IP Address Posted Multiple Child Pornography Images on Free6 Using Multiple Screen Names

17.    On DATE SCREEN CAPTURE WAS CONDUCTED (NOTE: MAYBE DIFFERENT FROM THE DATE SUSPECT UPLOADED IMAGES.), while monitoring "www.Free6.com" as an administrator, SA Burdick or SA Tim Alon or SA Kelley Hall or SA Todd Hammer found that on DATE IMAGE WAS UPLOADED, a user using the screen name "SCREEN NAME," utilizing the IP Address IP ADDRESS (the TARGET IP ADDRESS), had engaged in an online conversation with the user "SCREEN NAME OF PERSON YOUR SUSPECT SENT IMAGE TO (NOTE: SOME TARGETS POSTED TO THE ROOM AND NOT A SPECIFIC USER, SIMPLY CHANGE LANGUAGE

---

[6]    A website hosting company allows clients to make their websites available to others via the World Wide Web.

ACCORDINGLY)."   Screen captures of "SCREEN NAME'S" postings made during this conversation were obtained by SA Burdick or SA Alon (FBI) or SA Hall or SA Hammer AND ARE DETAILED BELOW:

      a.   On DATE, someone used the TARGET IP ADDRESS and the screen name "SCREEN NAME" to post the following images:

      i.   INSERT DESCRIPTION OF IMAGE(S) AND/OR VIDEO(S)

    18.   I also discovered several chat comments posted by the user utilizing the TARGET IP ADDRESS.   Among the messages posted between DATES, were the following – despite the use of the two screen names "SCREEN NAME" and "SCREEN NAME" different screen names, each post originated from the TARGET IP ADDRESS:

      a.   INSERT DESCRIPTION OF CHATS

    19.   I believe there is probable cause to review digital evidence from the time period between DATE and DATE. Individuals who distribute child pornography over the internet through the use of a computer had to have possessed the electronic data prior to sharing it.   For example, an individual could have first obtained a particular file months or years before sharing it over the internet.   Or the individual could be sharing the same images for years.   As a result, in order to establish ownership of a particular file, in my training and experience it may be necessary to review historical file information data.   Here, internet service with the current

provider was first established at the SUBJECT PREMISES on DATE.
The user in question discussed using different types of internet
uses, such as email, GigaTribe, and MSN. These indicate to me
that it is likely that the user had internet access prior to
DATE. I know that individuals can use different internet
service providers, and change to other carriers for a variety of
reasons. We therefore have probable cause to believe that the
electronic data linking the contraband to a particular user
could exist from the time period going back to a year prior to
the establishment of internet service. This is because we do
not have any information as to how long the computer(s) in
question have been owned and in use, or where the contraband
first originated. If, for example, a user obtained child
pornography through a source other than over the internet - such
as on a CD or through some other digital storage device, we
would need to review data from some time period before the
initiation on internet service. I believe we have probable
cause to search the data for the time period of DATE.

C.    Identification of The SUBJECT PREMISES

    20. On DATE, pursuant to a summons, INTERNET PROVIDER
advised that at the time the TARGET IP ADDRESS was used to make
the posts set forth in paragraph 17, was assigned to SUBSCRIBER
NAME at the SUBJECT PREMISES. Internet service by this provider

was established at the SUBJECT PREMISES on DATE.  (Alternate language:  On or about DATE OF SUMMON RESPONSE, in response to a subpoena issued by SA Burdick or SA Alon, NAME OF ISP provided the subscriber information for the IP Addresses TARGET IP ADDRESS.  NAME OF ISP reported that IP Address was registered to SUBSCRIBER INFO, and that the service of this IP Address was physically being provided to TARGET ADDRESS (the Subject Premises).

21.  On DATE, XXX conducted a check on (DATABASE CHECK) for the SUBJECT PREMISES.  (DATABASE CHECK) consolidates public records including addresses, driver licenses, property deed transfers and corporate information.  According to (DATABASE CHECK), associated with the address are INSERT NAME/S.

a.  According to (DATABASE CHECK)...

22.  DMV Paragraph.

23.  On DATE, ICE S/A XXXX observed a vehicle with STATE license plate XXXX in the driveway of the SUBJECT PREMISES.  According to DMV records, the car is registered to XXXXXXXXX. This leads me to believe XXXXXX still lives at the SUBJECT PREMISES.

## VII.  COMPUTER DATA

24.  Based on my own experience and consultation with other agents who have been involved in the search of computers and

retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

a. Computer storage devices, such as hard disks, diskettes, tapes, laser disks, and Bernoulli drives, can store the equivalent of hundreds of thousands of pages of information. Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names. As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

b. Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even those who are

computer experts to specialize in some systems and applications. It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data.   In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.   Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

25. Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.   There are several reasons that compel this conclusion:

a.   The peripheral devices that allow users to enter

18

or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

b.    In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases like the instant one where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and

hardware drivers) and any applications software which
may have been used to create the data (whether stored
on hard drives or on external media) for proper data
retrieval.

c.   I am familiar with and understand the
implications of the Privacy Protection Act ("PPA"), 42
U.S.C. § 2000aa, and the role of this statute in
protecting First Amendment activities.  I am not aware
that any of the materials to be searched and seized
from the SUBJECT PREMISES are protected materials
pursuant to the PPA.  If any such protected materials
are inadvertently seized, all efforts will be made to
return these materials to their authors as quickly as
possible.

26.  Based on the above information, there is probable
cause to believe that 18 U.S.C. §§ 2252 and 2252A, which, among
other things, make it a federal crime for any person to
knowingly possess and/or receive child pornography, have been
violated, and that the property, evidence, fruits and
instrumentalities of these offenses, more fully described in
Attachment B of this Affidavit, are located at the SUBJECT
PREMISES.  I request the authority to seize such material. It is
my assertion, based on previous investigative experience, that

evidence of the receipt and possession of child pornography will be located on a computer or computers located at the SUBJECT PREMISES and that this evidence can be forensically recovered from any computers used to commit the offenses that are at the location to be searched. I am aware that evidence located on hard drives is often recoverable months, and even years, after it has been placed on the hard drive through the use of data recovery software utilized by computer forensic examiners.

VIII.    **ITEMS TO BE SEIZED**

27.    Based on the foregoing, I respectfully submit that there is probable cause to seize the following items, which constitute evidence of violations of Title 18, United States Code Sections 2252A(a)(2) and 2252A(a)(5)(B), found at the SUBJECT PREMISES:

a.    Materials depicting or containing child pornography, as defined in Title 18, United States Code, Section 2256.

b.    Any record or document pertaining to the possession, receipt, distribution and/or reproduction of child pornography, as defined in Title 18, United States Code, Section 2256.

c.    Any record or document identifying persons transmitting, through interstate commerce, including by

21

computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

     d.  Any record or document referring to the production, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate commerce, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

     e.  Any record or document referring to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

     f.  Any record or document that lists names and addresses of any minor visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

     g.  Any record or document that shows the offer to transmit through interstate commerce any depictions of a minor engaged in sexually explicit conduct, as defined in Title 18,

United States Code, Section 2256.

h.   Any and all materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.   Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.   "Child erotica" may also include, in this context, sex aids and/or toys.

i.   Electronically stored communications or messages reflecting computer on-line chat sessions or e-mail messages with a minor that are sexually explicit in nature, as defined in Title 18, United States Code, Section 2256.

j.   Any documents, records, programs, or applications that identify the residents of the SUBJECT PREMISES.

k.   Any documents, records, programs or applications that identify the Internet service provided to the SUBJECT PREMISES.

l.   Any documents, records, programs, or applications tending to demonstrate the actual user(s) of computers found at

the SUBJECT PREMISES.

m.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

n.   In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

ii.   If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii.    If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

iv.    In searching the computer devices, the computer personnel may examine all of the data contained in the computer devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

v.    If the computer personnel seize the computer devices pursuant to subparagraph iii above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant.  If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized

pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device.  If the government needs additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

  o. In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

  i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

  ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, wireless and wired routers, wireless cards, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

  iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD_ROMs, CD-R, CD-RWs, DVDs, optical disks,

printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## IX.  CONCLUSION

26.  For all the reasons described above, there is probable cause to believe that evidence of violations of Title 18, United States Code, Sections 2252A(a)(2) and 2252A(a)(5)(B), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this affidavit.

NAME, Special Agent
Department of Homeland Security
U.S. Immigration & Customs Enforcement


Subscribed and sworn to before me
this _____ day of DATE, 2010.


HONORABLE
United States Magistrate Judge

**ATTACHMENT "A"**

**Premises to be Searched**

The SUBJECT PREMISES is further described as a DESCRIPTION

## ATTACHMENT "B"

### Items to be Seized

The following items to be seized constitute evidence of violations of Title 18, United States Code, Sections 2252A(a)(2) and 2252A(a)(5)(B), which may be found at the SUBJECT PREMISES:

      a.   Materials depicting or containing child pornography, as defined in Title 18, United States Code, Section 2256.

      b.   Any record or document pertaining to the possession, receipt, distribution and/or reproduction of child pornography, as defined in Title 18, United States Code, Section 2256.

      c.   Any record or document identifying persons transmitting, through interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

      d.   Any record or document bearing on the production, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate commerce, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e.   Any record or document pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

f.   Any record or document which lists names and addresses of any minor visually depicted while engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

g.   Any record or document which shows the offer to transmit through interstate commerce any depictions of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

h.   Any items displayed in the child pornographic images posted by the suspect to the Internet chat room described within the Affidavit herein.

i.   Any and all materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct.  Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education,

31

child pornography, sexual abuse of children, incest, child
prostitution, missing children, investigative techniques of
child exploitation, sexual disorders, pedophilia, nudist
publications, diaries, and fantasy writings.  "Child erotica"
may also include, in this context, sex aids and/or toys.

j.   Electronically stored communications or messages
reflecting computer on-line chat sessions or e-mail messages
with a minor that are sexually explicit in nature, as defined in
Title 18, United States Code, Section 2256.

k.   Any documents, records, programs, or applications
that identify the residents of the SUBJECT PREMISES.

m.   Any documents, records, programs or applications
that identify the Internet service provided to the SUBJECT
PREMISES.

n.   Any documents, records, programs, or applications
tending to demonstrate the actual user(s) of computers found at
the SUBJECT PREMISES.

o.   As used above, the terms records, documents,
programs, applications or materials include records, documents,
programs, applications or materials created, modified or stored
in any form.

p.   In searching for data capable of being read,
stored or interpreted by a computer, law enforcement personnel

executing this search warrant will employ the following procedure:

i.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

ii.   If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

iii.  If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be

seized set forth herein.

       iv.   In searching the computer devices, the computer personnel may examine all of the data contained in the computer devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.   In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

       v.   If the computer personnel seize the computer devices pursuant to subparagraph iii above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant.   If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device.   If the government needs additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the

warrant.

q.   In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

i. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, wireless and wired routers, wireless cards, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD_ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.